IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| BOBBY JIMENEZ, | § | CV. NO. 5:13-CV-877-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| SHERIFF RANDY BROWN, JAN | § | |
| QUINTANA, LISA NOLAN, CAPT. | § | |
| DELIA CASTRO, and SGT. | § | |
| MARTINA VILLARREAL , | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

ORDER AFFIRMING MEMORANDUM AND RECOMMENDATION

Before the Court are the Objections (Dkt. # 88) to Magistrate Judge

John W. Primomo's Memorandum and Recommendation (Dkt. # 80) filed by

Defendants Jan Quintana, Delia Castro, Lisa Nolan, Martina Villarreal, and

Medina County Sheriff Randy Brown (collectively, "Defendants").  After

reviewing the Objections and the supporting and opposing memoranda, the Court

**AFFIRMS** the Memorandum and Recommendation (Dkt. # 80)

BACKGROUND

Plaintiff Bobby Jimenez ("Jimenez" or "Plaintiff") is an inmate in the

custody of the Texas Department of Criminal Justice—Correctional Institutions

1

Division.  He attests that, in the early morning hours of October 14, 2011, an officer of the Castroville Police Department stopped him on suspicion of driving while intoxicated.  ("SJ Resp.," Dkt. # 72 at 2.)  He further attests the officer transported him in the police car's K–9 unit dog cage twice that evening: first, when he was transported from the stop location to the hospital for a blood test, and second, when he was transported from the hospital to Medina County Jail (the "Jail").  (Id. at   2–4.)  According to Jimenez, the cage was littered with animal excrement.  (Id.)

Jimenez arrived at the Jail shortly after 3:00 a.m. and went through the booking process at roughly 8:30 a.m.  (Id. at 6.)  Although he was unhurt, he attests that he was covered in animal excrement.  (Id.)  That day, he was not permitted to shower.  (Id.)

On October 15, 2011, intense itching awoke Jimenez.  (Id. at 7.) Upon investigation, he observed red dots on his stomach, face, arms, legs, and buttocks.  (Id.)  He explained to the officer on duty, Gary Morin ("Morin"), that he needed a shower.  (Id.)  After checking with his supervisor, Sergeant Martina Villarreal ("Villarreal"), Morin told Jimenez that he would need to wait to shower until he was moved to the general population.  (Id. at 7–8.)  He was then permitted to rinse off his face and arms.  (Id. at 8.)  Morin also brought Jimenez two packages of hydrocortisone cream.  (Id.)  Later that night, Jimenez was again

2

awoken by itching on his body.  (Id. at 9.)  He spoke with another officer on duty,

Estrada, who informed Jimenez that medical conditions would not be addressed at

night unless they were life threatening.  (Id.)

   On October 16, 2011, Jimenez was transferred to the general

population and permitted to shower.  (Id. at 10.)  Jimenez attests that he filled out a

sick call form on that day to set an appointment for October 20, 2011, the next time

an appointment would be available.[1]  (Id.)  He did not receive a medical

appointment on October 20, 2011.  (Id. at 11.)  Subsequently, he filled out another

sick call form requesting an appointment on October 27, 2011.  (Id. at 12.)  He did

not receive a medical appointment on October 27, 2011.  (Id. at 12.)

   After complaining to Villarreal about his condition and his inability to

obtain a medical appointment, Jimenez received another sick call form from

Villarreal.  (Id. at 12–13.)  Another officer, Delia Castro ("Castro"), then brought

Jimenez a tube of hydrocortisone, which she said was at the direction of the

medical team.  (Id. at 13.)  In an attempt to receive a medical appointment on

November 3, 2011, the date of the next available medical appointment, Jimenez

submitted sick call forms on October 27, 2011, October 31, 2011, and again on

November 2, 2011.  (Id. at 15; id., Ex. 42 (showing sick call request on 10/27).)

---

[1] The Jail provides medical care through a contract Physician's Assistant, who
visits the Jail for two hours once a week.  (Dkt. # 70, Ex. C at 1; Dkt. # 71, Ex. B at
2.)  When the Physician's Assistant is not at the facility, jail staff can call her
regarding patient complaints.  (Dkt. # 71, Ex. B at 2.)

Nevertheless, he did not receive a medical appointment on November 3, 2011.  (<u>Id.</u> at 15–16.)

After placing several sick calls the following week, Jimenez received a medical appointment on November 10, 2011.  (<u>Id.</u> at 16; <u>id.</u>, Ex. 22B.)  During this appointment, Castro provided security in the room.  (<u>Id.</u> at 16–19.)  Lisa Nolan, the physician's assistant that provides service at the Jail, ran a vital check on Jimenez and examined his rash.  (<u>Id.</u> at 16, 18.)  She concluded that his rash was caused by "the water."  (<u>Id.</u> at 18.)  Jimenez disagreed, and their disagreement led Castro and another officer to remove Jimenez from the examination room.  (<u>Id.</u> at 18–19.)  As Jimenez was leaving, Nolan told him that she was prescribing him a lotion.  (<u>Id.</u> at 19.)  At some point during this examination, Nolan also told Jimenez that she wanted to examine him again on November 17.  (<u>Id.</u> at 27.)

The next day, Villareal provided Jimenez with a medicated body wash, an anti-histamine, and an anti-fungal lotion.  (<u>Id.</u> at 20; <u>id.</u>, Ex. 22 (recording medication administration); <u>id.</u>, Ex. 22A (same).)  After using the body wash, Jimenez experienced severe burning across his body.  (<u>Id.</u> at 21.)  In response, an officer told him to scrub off the body wash.  (<u>Id.</u>)

On November 14, Jimenez submitted a sick call slip requesting treatment for his rash.  (<u>Id.</u> at 27.)  He also submitted a request for information about dental treatment because he was experiencing tooth pain.  (<u>Id.</u>; <u>id.</u>, Ex. 31.)

4

On November 15, Jimenez sustained a fall in the shower, which resulted in significant wrist pain.  (Id. at 27–28.)  He submitted a sick call slip requesting an appointment to evaluate his wrist.  (Id., Ex. 32.)  According to Jimenez, Officer Soliz assured Jimenez that he would receive an appointment with Nolan regarding his wrist and rash.  (Id. at 27–28.)  In response to Jimenez's complaints about tooth pain, Jimenez was also scheduled for a dental examination on November 17.  (Id. at 26–27.)

On November 17, Soliz escorted Jimenez to see the dentist.  (Id. at 28.)  When Jimenez learned that he was to see the dentist and would be unable to see Nolan, he demanded to see Nolan and asked that his dental appointment be cancelled.  (Id. at 29.)  In a heated exchange, Jan Quintana, Medina County Detention Center Jail Administrator ("Quintana"), told him that he could not see Nolan and brought Jimenez to see the dentist.  (Id.)  Although Jimenez did see the dentist, he was unable to see Nolan regarding his wrist or rash on November 17.  (Id. at 30; id., Ex. 32.)  However, Nolan prescribed naproxen to Jimenez in response to the request.  (Id., Ex. 32.)  Separately, his dentist also prescribed ibuprofen and an antibiotic.  (Id., Ex. 33 (recording clindamycin and ibuprofen prescriptions); id., Ex. 34 (recording administration of medications); id., Ex. 35 (ibuprofen prescription).)

On November 18, Jimenez submitted a sick call slip requesting an

5

appointment on November 24 regarding his rash and his wrist.  (<u>Id.</u> at 32; <u>id.</u>, Ex.

38.)  He did not receive a medical appointment on November 24.  (<u>Id.</u>)  On

November 27, 2011, Jimenez submitted a request for emergency medical treatment

to Quintana because the fungus had affected his anal opening.  (<u>Id.</u> at 33.)

On November 28, he also submitted a sick call slip requesting an

appointment.  (<u>Id.</u>)  The same day, Officers Castro and Morin entered his cell to

examine the lights.  (<u>Id.</u>)  Jimenez asked them for help with his condition.  (<u>Id.</u>)

After he showed his body to Morin, Jimenez attests that Castro and Morin set up

an appointment for Jimenez with Nolan at 2:00 p.m.  (<u>Id.</u> at 34; <u>see also</u> <u>id.</u>, Ex. 46

(undated sick call slip requesting 2:00 p.m. appointment for rash on lower

abdomen and legs in handwriting different from Jimenez's other sick call slips).)

Nolan was unable to see Jimenez, but directed the officers to provide Jimenez with

Nystatin/Triamcinalone cream.  (<u>Id.</u>)  Instead, Castro provided him with foot

fungus cream from Wal-Mart.  (<u>Id.</u> at 35.)

Jimenez received an appointment with Nolan on December 1.  (<u>Id.</u>,

Ex. 46.)  During the appointment, Nolan indicated that she planned to order blood

work for Jimenez because she was concerned about his high blood pressure.  (<u>Id.</u> at

36.)  When Jimenez tried to call attention to his skin condition, Castro, who was

also present in the examination room, cut him off and interfered with the treatment.

(<u>Id.</u>)  As Jimenez was leaving, Nolan stated that she was prescribing him with body

6

wash.  (Id.)  When Castro prevented him from having further conversation with Nolan, he became upset and engaged in a heated exchange with Castro and Quintanta.  (Id.)

On December 2, Jimenez received an anti-fungal body wash, as well as oral anti-fungal and high blood pressure medications.  (Id., Ex. 47.)  Although he completed the body wash regimen, the treatment did not eliminate the rash.  (Id. at 36.)  Sometime thereafter, Jimenez placed a sick call request for an appointment on December 15, but did not receive an appointment.  (Id. at 39–40.)  He continues to suffer from small outbreaks of the rash.  (Compl. at 17.)

On November 14, 2013, Jimenez filed an amended complaint against Quintana, Castro, Nolan, Villareal, and the Medina County Sheriff Randy Brown, alleging the facts described herein.  (Dkt. # 6.)  Defendants filed the instant motions to dismiss, or in the alternative, for summary judgment, on May 5, 2014.  (Dkt. # 70 (filed by Nolan); Dkt. # 71 (filed by remaining defendants jointly.)  In response, Jimenez filed a "Pro-Se Motion to Deny Defendant's Motion for Summary Judgment."  (Dkt. # 73.)  Defendants timely submitted responses.  (Dkts. ## 74, 75.)

On July 8, 2014, Magistrate Judge Primomo issued his Memorandum and Recommendation, which concluded that the Court should grant Nolan's motion, grant summary judgment for the remaining individual defendants, and

deny summary judgment as to the claims against Brown in his official capacity.

("M&R," Dkt. # 80 at 1–2.)  On July 22, 2014, Defendants filed their objections to

the Magistrate Judge's Memorandum and Recommendation, contending that the

motion for summary judgment should be granted as to the claims against Brown in

his official capacity because (1) the Memorandum wrongly concluded that episodic

acts constituted a policy, practice, or custom of Medina County and (2) the

Memorandum incorrectly found that the Jail's correctional officers were not

trained to evaluate medical conditions.  (Dkt. # 85 at 3–5.)  On August 15, 2014,

Jimenez submitted his response to Defendants' objections, indicating that he

agreed with the Magistrate Judge's findings.  (Dkt. # 86 at 2.)

LEGAL STANDARDS

I.      Review of a Magistrate Judge's Memorandum and Recommendation

        Any party may contest the Magistrate Judge's findings by filing

written objections within fourteen days of being served with a copy of the

Memorandum and Recommendation.  28 U.S.C. § 636(b)(1)(C).  The objections

must specifically identify those findings or recommendations that the party wishes

to have the district court consider.  Thomas v. Arn, 474 U.S. 140, 151 (1985).  A

district court need not consider "[f]rivolous, conclusory, or general

objections."  Battle v. U.S. Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987)

(quoting Nettles v. Wainwright, 677 F.2d 404, 410 n.8 (5th Cir. 1982), overruled

8

on other grounds by Douglass v. United States Auto. Ass'n, 79 F.3d 1415 (5th Cir. 1996)).

The Court must conduct a de novo review of any of the Magistrate Judge's conclusions to which a party has specifically objected.  See 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.").  On the other hand, findings to which no specific objections are made do not require de novo review; the Court need only determine whether the Memorandum and Recommendation is clearly erroneous or contrary to law.  United States v. Wilson, 864 F.2d 1219, 1221 (5th Cir. 1989).

II.     Motion for Summary Judgment

A movant is entitled to summary judgment upon showing that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); see also Meadaa v. K.A.P. Enterprises, L.L.C., 756 F.3d 875, 880 (5th Cir. 2014).  A dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, the nonmoving party must

come forward with specific facts that establish the existence of a genuine issue for trial.  Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

In deciding whether a fact issue has been created, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  Kevin M. Ehringer Enters. v. McData Servs. Corp., 646 F.3d 321, 326 (5th Cir. 2011) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).  However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."  United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

In prisoner pro se cases, "[s]ummary judgment, although a useful device, must be employed cautiously because it is a final adjudication on the merits."  Jackson v. Cain, 864 F.2d 1235, 1241 (5th Cir. 1989).  As the Fifth Circuit has described: "Because [summary judgment] consequences are so severe,

10

. . . we must always guard against premature truncation of legitimate lawsuits merely because of unskilled presentations." Id. (internal quotation marks omitted) (quoting Murrell v. Bennett, 615 F.2d 306, 311 (5th Cir. 1980)).

DISCUSSION

In his Memorandum and Recommendation, the Magistrate Judge concluded that the right to privacy and right to medical care claims against Nolan should be dismissed, as should the denial of medical care claims against Quintana, Castro, and Villareal.  (R&R at 8–15.)  However, the Magistrate Judge also found that a genuine issue of fact remains as to the denial of medical care claim against Brown in his official capacity.  (Id. at 15.)

Defendants Quintana, Castro, Martina, and Brown object to the Magistrate Judge's findings that a fact issue exists regarding Brown's liability in his official capacity for denial of medical care.  (Dkt. # 85 at 2.)  Jimenez did not file objections to the Memorandum and Recommendation.[2]

I.    Claims Against Lisa Nolan

Because no party objects to the Magistrate Judge's findings regarding the claims against Nolan, the Court reviews the findings only to determine if they

---

[2] Following Defendants' Objections, Jimenez submitted a documented titled "Plaintiff's Reply to Defendant's Objection to Memorandum and Recommendation Docket 80."  (Dkt. # 86.)  Although the Court must liberally construe pro se pleadings, the Court does not construe this Response as an objection to the Memorandum because Jimenez states, "Plaintiff agrees with Judge Primomo [sic] decision and will support his findings."  (Id. at 2.)

are clearly erroneous or contrary to law.  The Court agrees with the Magistrate

Judge that Jimenez has failed to show a violation of his right to privacy or right to

medical care by Nolan.  Jimenez first alleges a right to privacy claim, premised on

the fact that Nolan permitted Castro to be present in the examination room during

Jimenez's medical exam.  As the Magistrate Judge observes, the Fifth Circuit has

expressly ruled that cross-sex surveillance of prisoners is constitutional when it

furthers a penological interest.  Oliver v. Scott, 276 F.3d 736, 741 (5th Cir. 2002).

Given Nolan's testimony, the Magistrate Judge correctly concluded that there was

a valid penological interest in Castro's presence in the room and that Fifth Circuit

case law therefore forecloses Jimenez's right to privacy claim against Nolan.

The Court also agrees that Jimenez has failed to show a violation of

his right to medical care by Nolan.  Jimenez alleges that Nolan's failure to see him

on various occasions, her failure to diagnose the correct cause of his rash, and her

failure to prescribe him appropriate medications violated his constitutional right to

adequate medical care.  As the Magistrate Judge observes, a pretrial detainee has

the clearly established right not to be denied attention to his serious medical needs

by the deliberate indifference of jail personnel.  Brown v. Callahan, 623 F.3d 249,

253 (5th Cir. 2010).  However, the Magistrate Judge correctly concludes that

Jimenez's summary judgment evidence fails to establish that Nolan was

deliberately indifferent to Jimenez's serious medical needs, since the facts alleged

can only establish, at the worst, that Nolan was negligent in her treatment of Jimenez.

Accordingly, Jimenez cannot prevail on his constitutional claims against Nolan as a matter of law, and summary judgment in favor of Nolan is proper.

II.    <u>Claims Against County Defendants in Individual Capacities</u>

Because no party objects to the Magistrate Judge's findings regarding the claims against the County Defendants in their individual capacities, the Court reviews the findings only to determine if they are clearly erroneous or contrary to law.  The Court agrees that Jimenez has failed to show a violation of his right to medical care against the county defendants.  The basis of Jimenez's complaint is that Villareal and Estrada barred him from showering for two days, despite his intense itching, and that he was unable to obtain an appointment with Nolan until November 10, over three weeks after his arrival at the Jail.  He also contends that Castro violated his right to privacy by being present during his medical examination.

Although episodic acts and omissions causing delay in medical care can rise to a constitutional violation, those delays must be a result of deliberate indifference by jail staff resulting in substantial harm.  <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 195 (5th Cir. 1993).  As the Fifth Circuit has described:

> Deliberate indifference in the context of an episodic failure to provide reasonable medical care to a pretrial detainee means that: 1) the official was aware of facts from which an inference of substantial risk of serious harm could be drawn; 2) the official actually drew that inference; and 3) the official's response indicates the official subjectively intended that harm occur.  However, deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of harm.

Thompson v. Upshur Cnty., 245 F.3d 447, 458–59 (5th Cir. 2001) (internal citations omitted).  "[D]eliberate indifference is an extremely high standard to meet"; it requires the plaintiff to show that "the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'"  Domino v. Tex. Dep't Crim. Justice, 239 F.3d 752, 756 (5th Cir. 2001) (quoting Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985).

There is no evidence in the record that, by denying Jimenez a shower, the officers wantonly disregarded a serious medical need.  Instead, the evidence shows that the officers complied with general policy by providing him a shower before his transfer into the general jail population and, in the meantime, providing him with hydrocortisone cream to relieve his itching.  The Court agrees with the Magistrate Judge that "[w]hile [Jimenez] was undoubtedly extremely uncomfortable from the itching caused by the rash [in his first 62 hours at the Jail], there is no basis in the summary judgment evidence for concluding that Jimenez suffered substantial harm as a result of the inaction by Sgt. Villareal."  (M&R at

14

14.)

Similarly, the Court agrees that there is no evidence in the record that Castro, Quintana, and Villareal denied Jimenez access to medical care on the days that he requested sick call.  Jimenez's summary judgment evidence suggests that the delay in receiving care was because the Jail only provided access to the physician's assistant once a week for two hours.  The Court also agrees that any alleged interference by Castro and Quintana during Jimenez's medical examinations did not affect Nolan's ability to provide appropriate and necessary medical treatment to Jimenez during his visits.

Finally, the Court agrees that Jimenez cannot establish facts showing that Castro violated his right to privacy for the reasons discussed supra, section I. Accordingly, Jimenez cannot prevail on his constitutional claims against the individual county defendants as a matter of law, and summary judgment in favor of the individual county defendants is proper.

III.   Claims Against Brown

Because Defendants object to the Magistrate Judge's findings regarding the claims against Brown in his official capacity, the Court reviews the findings de novo.  The Court addresses Defendants' specific objections in Section IV, infra.

Jimenez alleges that Brown violated his rights by promulgating

"administrative polic[ies] and procedures."  (Dkt. # 6 at 3.)  His specific factual allegations identify the following policies as the basis for his claim: (1) the showering policy preventing pretrial detainees from showering before moving into the general population; (2) the policy preventing guards from addressing medical conditions at night, unless those conditions are life-threatening; (3) the medical policy, which only provides detainees access to in-person medical care once a week for two hours; and (4) a custom of throwing away complaints.

A.      Individual Versus Official Capacity Liability

Because "Section 1983 offers no respondeat superior liability," supervisory officials are not vicariously liable for the actions of their subordinates.   Pineda, 291 F.3d 325, 328 (5th Cir. 2002); Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987).  However, § 1983 imposes supervisory liability when a supervisor who was not personally involved in the events giving rise to the constitutional violation nevertheless (1) fails to adequately train or supervise the officers involved in the constitutional deprivation, and that failure gave rise to the deprivation, or (2) "implement[s] a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation."  Porter v. Epps, 659 F.3d 440, 446 (5th Cir. 2011); Thompson v. Upshur Cnty., Tex., 245 F.3d 447, 459 (5th Cir. 2001); Thompkins, 828 F.2d at 304 (internal quotation marks omitted).

16

A supervisory official can also be liable in his official capacity if he is the type of "final policymaker" whose decisions represent the decisions of the county.  City of St. Louis v. Praprotnik, 485 U.S. 112, 123–24 (1988) (noting that "identification of policymaking officials is a question of state law"); accord Valle v. City of Hous., 613 F.3d 536, 542 (5th Cir. 2010).  In that instance, the case is effectively a suit against the municipality.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989).

Because Jimenez does not identify whether he brings claims against Brown in his individual or official capacity, the Court must look to the course of the proceedings to determine the nature of his claims.  See Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985) (holding that in cases where the plaintiff fails to specify whether officials are sued personally or in their official capacity, the court must make the determination based on the "course of proceedings"); accord United States ex rel. Adrian v. Regents of Univ. of Cal., 363 F.3d 398, 402–03 (5th Cir. 2004).  Factors relevant to the inquiry include the substance of the complaint, the nature of relief sought, and statements in dispositive motions and responses.  See United States ex rel. Adrian, 363 F.3d at 402–03.

Here, the course of proceedings demonstrates that claims alleged against Brown are official capacity claims.  The claims against Brown are significantly different than those alleged against the other defendants: while

Jimenez alleges conduct-based claims against the other defendants, he alleges policy-based claims against Brown.  (Dkt. # 6 at 3.)  In their Motion for Summary Judgment, Defendants address their liability in both their individual and official capacities.  In addressing the individual capacity claims, Defendants limit their discussion to conduct-based claims, rather than the policy-based claims.  (See Mot. at 6–10.)  Defendants address the policy claims only to the extent that they impact municipal liability.  (See id. at 10–12.)  While Jimenez has proceeded pro se, his Response does not suggest that Brown should be liable in his individual capacity.  Given the nature of the claims and the manner in which they have been addressed by the parties, the Court construes the claim against Brown to be a claim against Brown in his official capacity.

  B. <u>Nature of Claims</u>

   When bringing a constitutional challenge, a pretrial detainee can proceed under two alternative theories: a "conditions of confinement claim"  or an "episodic acts or omissions" claim.  <u>Shepherd v. Dall. Cnty.</u>, 591 F.3d 445, 452 (5th Cir. 2009).  A conditions of confinement claim is a challenge to the broad policies and practices of a jail that ultimately cause a plaintiff's injuries.  <u>Id.</u>  Most frequently, the condition is "the manifestation of an explicit policy or restriction: the number of bunks per cell, mail privileges, disciplinary segregation, etc."  <u>Id.</u> Less frequently, the condition "reflect[s] an unstated or <u>de facto</u> policy, as

evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by jail officials, to prove a condition or practice.'" Id. (internal editing marks omitted).

When a plaintiff "cannot establish the existence of any officially sanctioned unlawful condition," a plaintiff can bring an episodic acts or omissions claim, which challenges particular wrongs committed by individual defendants against the plaintiff. Id. "In these cases, an actor is usually interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." Id. (internal quotation marks omitted).

Analytically, conditions of confinement and episodic acts and omissions claims impose different culpability standards. While plaintiffs setting forth a traditional episodic acts and omissions claim must show that the defendants acted with deliberate indifference, plaintiffs setting forth a conditions of confinement claim are "relieved from the burden of demonstrating . . . actual intent to punish because . . . intent may be inferred from the decision to expose a detainee to an unconstitutional condition." Id.

In his claims against Brown, Jimenez identifies specific policies as the moving force behind the constitutional violations that he alleges. His focus is not

on the particular acts of Brown; it is on the failure of Brown's policies to provide

him with adequate care.  Accordingly, the Court finds that Jimenez's claims

against Brown are properly analyzed as conditions of confinement claims.  See,

e.g., Smith v. Kaufman Cnty. Sheriff's Office, No. 33:10-CV-703-L-BK, 2011 WL

7547621, at *13 (N.D. Tex. Dec. 14, 2011), report and recommendation adopted

sub nom. Smith v. Kaufman Cnty. Sheriff, 2012 WL 850777 (N.D. Tex. Mar. 14,

2012) (finding that "[p]laintiff's policy-based claims" against the sheriff were

conditions of confinement claims because his allegations about failure to receive

timely treatment arose out of inadequate policies at the jail).

     C.     Sufficiency of the Evidence—Conditions of Confinement Claim

     As discussed above, a suit brought against a county official is a suit

against the county.  Will, 491 U.S. at 71.  A county is liable under § 1983 for

constitutional violations arising out of policies or practices officially adopted and

promulgated by the government's officers.  City of St. Louis v. Praprotnik, 485

U.S. 112, 121 (1988); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).

Because a county cannot incur § 1983 liability under a respondeat superior theory,

it can only be liable "for acts directly attributable . . . 'through some official action

or imprimatur.'"  Peterson v. City of Fort Worth, Tex., 588 F.3d 838, 847–48 (5th

Cir. 2009) (quoting Piotrowski v. City of Hous., 237 F.3d 567, 578 (5th Cir.

2001)).

To establish municipal liability under § 1983, a plaintiff must prove that (1) a policy maker promulgated (2) an official policy or custom that (3) was the moving force behind the violation of the plaintiff's constitutional rights. Monell, 436 U.S. at 694; accord Zarnow v. City of Witchita Falls, Tex., 614 F.3d 161, 166 (5th Cir. 2010).

### 1. Policy or Custom

A policy or custom is either (1) a written policy statement, ordinance, or regulation officially promulgated by county officials, or (2) a widespread practice of municipal officials or employees that is "so common and well-settled as to constitute a custom that fairly represents municipal policy." Peterson, 588 F.3d at 847 (quoting Piotrowski, 237 F.3d at 578).

Of the four policies and practices that Jimenez identifies, only two are sufficient to move past this first prong. To support his claims that the Jail has a policy that guards cannot address non-life-threatening medical conditions at night or that the guards discard complaints, Jimenez presents only his own statements that he was told the policies existed. Jimenez's hearsay recitations of third-party statements and own conclusory statements are insufficient to meet his burden at the summary judgment stage. Accordingly, there is insufficient evidence to show a policy or practice that Medina County guards cannot address non-life-threatening medical conditions at night or that they discard inmates' complaints.

There is sufficient evidence in the record, however, to show that there were policies in place regarding medical staffing and showering.  According to the record evidence, the Jail contracts its medical staff through the Medina County Hospital, which provides the Jail with a Physician's Assistant to see detainees and inmates at the facility for two hours each week.  (Dkt. # 70, Ex. C at 1; Dkt. # 71, Ex. B at 2.)  To obtain an appointment with the Physician's Assistant, a detainee must fill out a "sick call slip."  (Dkt. # 71, Ex. B at 2.)  The sick call slips are screened by jail staff and then forwarded to the Physician's Assistant for review. (Dkt. # 73, Ex. 50.)  The Physician's Assistant reviews all sick call slips provided to her and, based on her medical knowledge, decides which inmates need an appointment.  (Id., Ex. 14.)  In addition, jail staff can call the Physician's Assistant regarding patient complaints at the times when the Physician's Assistant is not at the facility.[3]  (Dkt # 71, Ex. B at 2.)  The jail staff screening the sick call slips have no medical field training, but have received training on recognizing and referring sick call requests for health services through a mandatory corrections officer training administered by the Texas Commission on Law Enforcement Officer Standards and Education ("TCLOSE").  (Id., Ex. 21; Obj., Ex. A at 11–16.)

Though it is likely that there are written documents setting forth these

---

[3] Defendants assert in their Objections that inmates are also provided emergency care through a local hospital, but the document that they cite as evidence supporting the statement does not contain such information.  (Obj. at 3.)

statements as written policy, Jimenez has not provided such evidence to the Court. Nevertheless, because the practices are so widespread, they are at the very least a widespread practice sufficient to give rise to municipal liability.

Additionally, the record demonstrates that there is a written policy statement on showering, which provides "Inmates in holding will be showered as needed but given at least 1 shower in 48 hours and must be showered before being housed in population." ("MSJ," Dkt. # 71, Ex. A–4 at 2.) However, the written policy does not provide, as Jimenez alleges, that detainees cannot shower before moving into the general population.[4]

### 2.   Moving Force

To show that a policy was the moving force behind the constitutional violation, a plaintiff must show both causation and culpability. See Piotrowski v. City of Hous., 237 F.3d 567, 580 (5th Cir. 2001). With respect to causation, the plaintiff must show a direct causal link between the municipal policy and the constitutional deprivation. Id. "Th[e] connection must be more than a mere 'but for' coupling between cause and effect"; a showing of proximate cause is necessary. Johnson, 379 F.3d at 310. Accordingly, a superceding or interfering cause can bar liability. Murray v. Earle, 405 F.3d 278, 290 (5th Cir. 2005).

---

[4] Jimenez does not present evidence that there is a custom or practice that detainees cannot shower before moving into the general population that is so widespread as to amount to policy. The only evidence he presents on this issue is his own experience, which is insufficient to establish independently a custom or practice.

In a conditions of confinement case—unlike in an episodic acts and omissions case—culpability is assessed under the test set forth in <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979). <u>Hare</u>, 74 F.3d 633, 644–45 (5th Cir. 1996). Under the <u>Bell</u> standard, a policy can give rise to liability when the condition at issue amounts to punishment—that is, when the condition is not reasonably related to a legitimate governmental objective. <u>Id.</u> at 539.

a.  <u>Medical Care Policy</u>

Pretrial detainees have a clearly established right to adequate medical care while in custody. <u>Brown</u>, 623 F.3d at 253. Accordingly, Jimenez must show that the medical care policies were deficient in providing constitutionally adequate medical care and that he was subjected to those policies while seeking treatment for his injuries.

In support of his claim, Jimenez presents an interrogatory from Nolan, in which she states "I review all sick call slips given to me, however, I do not always actually see everyone that placed a request. I use my medical knowledge and any medical history I have regarding a particular inmate to decide who needs to be seen." (Resp., Ex. 14.) Jimenez also presents evidence showing that the population of the Jail ranged from 69 to 84 detainees and inmates during the months of October and November 2011. (Dkt. # 73, Exs. 1, 4, 5, 5A, 17, 18, 19, 22, 27, 23, 23A, 24.) Although Nolan is apparently available for off-duty calls, she

never provided such care for Jimenez even though he was repeatedly unable to see her during her normal hours.

Jimenez presents evidence that, from October 16, 2011, to November 28, 2011, he submitted at least ten sick call slips requesting to be seen on nine different occasions for reasons related to his rash.[5]  Nevertheless, Jimenez only received two appointments: the first on November 10, almost a month after submitting his first complaint, and the second on December 1.  On three other occasions that Jimenez could not be seen, Nolan prescribed him treatment without seeing him for an appointment.

Throughout this period, Jimenez's rash, which began as intense itching on his stomach, face, arms, legs, and buttocks, worsened and eventually spread to his anal opening.  During this time, he also suffered a reaction to prescribed medication.  He continues to suffer small outbreaks of the rash.

Drawing all inferences in favor of Jimenez, there is a question of fact as to whether the jail was able to provide constitutionally adequate medical care to detainees during the two hours each week that the Jail provides and whether the limited availability of care caused Jimenez's injuries.  Accordingly, there is a genuine issue of material fact as to whether the Jail's policy regarding medical

---

[5] Although Defendants contend that the they only received four sick call slips from Jimenez, the Court must take the evidence in the light most favorable to the plaintiff at the summary judgment stage.  Kevin M. Ehringer Enters., 646 F.3d at 326.

staffing proximately caused the delay in medical care.

Finally, the Government presents no evidence as to a legitimate governmental interest reasonably related to the delay in medical care.  Given the pattern of repeated delay in his ability to access medical treatment, Jimenez has demonstrated sufficient evidence to raise a genuine issue of material fact as to whether the delay in medical care constitutes punishment under the Bell standard. See Shepherd v. Dall. Cnty., 591 F.3d 445, 455 (5th Cir. 2009) (emphasizing that, in a conditions of confinement case, "a detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights.").

b.    Showering Policy

There is no evidence that the Jail's showering policy was the moving force behind a constitutional deprivation on its own.  See Hamilton v. Lyons, 74 F.3d 99, 107 (5th Cir. 1996) (finding that deprivation of a shower for three days did not give rise to a constitutional violation); see also McKinney v. Grant Sheriff Dep't, No. 12-CV-937, 2013 WL 10987151, at *2 (W.D. La. Jan. 23, 2013), report and recommendation adopted by 2013 WL 1098158 (W.D. La. Mar. 15, 2013) (same).  Moreover, even if Jimenez's rash constituted an independent constitutional violation, any delay in showering afforded by the policy was not the

proximate cause, since the delay in medical care constitutes a superceding cause.

Accordingly, the showering policy does not give rise to liability under § 1983.

        3.     <u>Promulgated by a Final Policy Maker</u>

      Because Jimenez has not presented evidence a written document that lays out the policies regarding medical care and instead presents evidence to show a custom, he must demonstrate that a final policymaker had actual or constructive knowledge of the policies.  <u>See</u> <u>Bennett v. City of Slidell</u>, 735 F.2d 861, 862 (5th Cir. 1984) (en banc).  "A municipal policymaker is someone who has 'the responsibility for making law or setting policy in any given area of a local government's business.'"  <u>Valle v. City of Hous.</u>, 613 F.3d 536, 542 (5th Cir. 2010) (quoting <u>Praprotnik</u>, 485 U.S. 112, 125 (1988)).  Whether an official has policy making authority is a question of state or local law.  <u>Jett v. Dall. Indep. Sch. Dist.</u>, 491 U.S. 701, 737 (1989).

      Texas law is clear that a sheriff is a county's "final policymaker in the area of law enforcement," including county jails.  <u>Colle v. Brazos Cnty., Tex.</u>, 981 F.2d 237, 244 (5th Cir. 1993); <u>see also</u> Tex. Loc. Gov't Code § 351.041(a).  Accordingly, Sheriff Brown is a final policymaker for jail-related policy in Medina County.

      Although evidence of the medical policies comes from affidavits and sworn testimony rather than contracts and employee manuals, there is a question of

27

fact as to whether Brown had at least had constructive knowledge of the policies. Unlike in typical custom or practice cases where the custom or practice is informally implemented by employees, the procedures in place regarding medical care arose out of formal contracts between the Jail and Medina County Hospital. As the final policymaker for the Jail, there is a question of fact as to whether Brown had knowledge or can be attributed knowledge of those contracts.

Accordingly, because genuine questions of fact exist as to each of the elements of the conditions of confinement claim against Brown, the Court **DENIES** summary judgment on that basis.  Accordingly, the Court **AFFIRMS** the Magistrate Judge's Memorandum and Recommendation, albeit on slightly different grounds.  See, e.g., Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A., 754 F.3d 272, 276 (5th Cir. 2014) (quoting Holtzclaw v. DSC Commcn's Corp., 255 F.3d 254, 258 (5th Cir. 2001)) ("An appellate court may affirm summary judgment 'on any ground supported by the record, even if it is different from that relied on by the district court.'").

II.    Objections

Defendants object to the Magistrate Judge's Memorandum and Recommendation on two grounds.  First, Defendants argue that the Magistrate Judge wrongfully found that episodic acts of Nolan constituted a policy, practice, or custom and improperly imputes respondeat superior liability on the county for

her actions.  (Obj. at 3.)  Second, Defendants argue that the Magistrate Judge

wrongfully concluded that the Jail's officers were not trained to evaluate medical

conditions.  (Id. at 4.)  Because the Court resolves the claims against Brown in the

same way as does the Memorandum and Recommendation, the Court addresses

objections in turn.

A.     Episodic Acts as Policy, Practice, or Custom

Defendants first contend that the Magistrate Judge's analysis of the

claims against Brown relied on (1) the fact that Nolan did not often see Jimenez,

despite his sick call requests and (2) the fact that Nolan is only available one day a

week for two hours, but ignores the fact that she is on-call for complaints and that

inmates have access to emergency care.  (Id. at 3.)  Accordingly, Defendants

contend that the Court is holding the County liable for Nolan's actions, which

directly controverts the holding of Monell.  (Id. at 4.)

As the Court has described at length, a county cannot be held liable on

a respondeat superior theory for the wrongdoings of its employees.  However, the

county can be liable for implementing unconstitutional policies and customs.

Defendants mischaracterize the Magistrate Judge's analysis as falling within the

first impermissible category, when, in fact, it falls squarely within the second.

Nolan's hours at the facility are not particular wrongs committed by her: they are

the physical manifestation of the Jail's medical policies.  Moreover, the mere fact

of emergency services does resolve the question as to whether the Jail can provide constitutionally adequate medical care within the constraints of its existing policies.  Accordingly, the claims are properly analyzed as policy-based claims.

    B.    <u>Training of Correctional Officers</u>

Second, Defendants argue that the Magistrate Judge incorrectly concluded that "Defendants acknowledge that Sheriff Brown, Administrator Quintana and Capt. Castro were not trained medically" and "[p]resumably, other correctional personnel at the jail have no medical training."  (<u>Id.</u> at 4.)  The Magistrate Judge's conclusion was based on the County's interrogatory response submitted as an exhibit to Jimenez's Response.  In the interrogatory, Jimenez requested a "[l]ist of training provided by Medina County in medical field.  This includes Jan Quintana/Delia Castro."  (Resp., Ex. 21.)  Defendants responded, "Neither Jan Quintana, nor Delia Castro were employed by Medina County in a medical role and, as such, received no medical field training from Medina County. Medina County contacts [sic] its medical services out to licensed healthcare providers."  (<u>Id.</u>)

Given the evidence in the record, the Magistrate Judge reasonably concluded that the Jail's correctional officers did not have medical training, despite their role in screening sick call slips.  However, in their Objections, Defendants provide additional evidence that shows that officers receive training on recognizing

and referring sick call requests for health services through a mandatory corrections officer training administered by TCLOSE.  The Court has incorporated this evidence into its analysis in Section I.C.1, supra.

CONCLUSION

For the aforementioned reasons, the Court **AFFIRMS** the Magistrate Judge's Memorandum and Recommendation (Dkt. # 80), although does so on different grounds with respect to the claims against Brown in his official capacity. Accordingly, the Court **GRANTS** Nolan's Motion to Dismiss and Motion for Summary Judgment (Dkt. # 70), **GRANTS** the County Defendants' Motion for Summary Judgment (Dkt. # 71) as pertaining to the claims against Quintana, Castro, and Villareal, and **DENIES** the County Defendants' Motion for Summary Judgment (Dkt. # 71) as pertaining to the claims against Brown in his official capacity.

**IT IS SO ORDERED.**

**DATED**: San Antonio, Texas, January 8, 2015.

_____
David Alan Ezra
Senior United States Distict Judge

31